Good morning, Your Honor. May it please the Court, my name is Ken Hogan. I'm here on behalf of LaKisha Neal-Lomax, plaintiffs below at all, plaintiffs below and appellants herein, and I would ask to reserve two minutes for rebuttal. Appellants respectfully request that this Court reverse the grant of summary judgment by the District Court on the following grounds. The District Court erred as a matter of law when it failed to apply the substantial factor standard to the appellant's product liability claim. The District Court abused its discretion in excluding the testimony of Dr. Brett H. Woodward on a basis that goes to the weight, not the admissibility, of the expert's testimony. The District Court erred when it failed to consider that Officer Rader's conduct was not objectively reasonable when viewed even in light of Las Vegas Metropolitan Police Department's own stated policies. The facts on appeal are fairly straightforward. Willie Lomax was alive, walking around a parking lot at the Emerald Breeze Apartments in Las Vegas, Nevada. The story ends, Willie Lomax was dead. The questions of material fact at issue today concern what happened between Willie Lomax walking around in a parking lot and arriving at a hospital in a state that appellee's own expert described as, quote, incompatible with life. And what is, what happened is very clear from the record. Willie Lomax was tased repeatedly, five times within a two-minute time span after he was taken into custody, after he was handcuffed, laying face down on a medical gurney. The taser weapon, it is undisputed, is designed to emit an electronic discharge that disrupts the skeletal, the major muscles of the skeletal system. Isn't that dependent upon what mode it's used in as to whether it induces the muscle interruption? No, Your Honor. There are two different modes, actually, that it's used in. One is the projectile, one is the drive-stun mode, but both emit electricity and both cause the, cause a muscular contraction. Isn't it correct that only, that in the drive-stun mode, it does not override the central nervous system? That may be the case, Your Honor, in terms of the total nervous system. Isn't that the key to the respiratory function? Say that again, Your Honor? Isn't that the key to the respiratory function? Not necessarily, Your Honor. When, when the skeletal muscles contract, and this goes to the testimony of one of the experts that stated that the human being's ability to breathe depends on the ability of the muscles around the ribcage to expand and allow breathing. When that contracts, and especially over an extended period of time, it would prevent free breathing. So, although the application in terms of the central nervous system would be different in the different modes, we believe that the, that since both emit an electrical discharge, that both would cause some type of a skeletal, or a muscular contraction. Is Dr. Woodward of the opinion that use of the taser in the drive-stun mode did result in terminating or interrupting the central nervous system? I believe his opinion was that, are you talking about Dr. Woodard? Woodard. Noblock. No, Woodard. Woodard. The expert. He stated that, I think he stated that it would cause a skeletal muscular contraction, is what I have, Your Honor. I'll check on that as we go forward here, but I believe that's the case. As to the first issue on appeal, the district court did err as a matter of law when it applied the incorrect standard to the product liability claim. The district court founded its grant of summary judgment on the improper standard for causation, requiring the plaintiffs to show to a reasonable degree of medical certainty that the product defect caused the injury. The court's erroneous application of but-for causation, as is repeatedly evident in the order, is founded on two separate citations. The court looked to Fisakis and also Morisato for the proposition that but-for cause is required. Neither of those two cases is a good foundation for causation standard and product liability for the following reasons. Although the statement quoted by the court does appear in Fisakis, Fisakis is a five-paragraph long decision in which causation was, according to that court on page 571, undisputed in that case. In other words, this was not a case that was discussing causation, and therefore the court gave it short shrift. In fact, the only mention of causation in that case is in a string of elements. And it does say that the plaintiff is required to show that the product defect was the cause, but it doesn't go into how that is done. And you show that the product defect was a cause in a product liability action through application of the substantial factor test. And the court should have looked to Price v. Kern, which is a Nevada decision that more ably describes it. To find the proper standard for product liability in Nevada law, the district court looking at that case would have noted that a product defect is a substantial factor in producing an injury, and then it is a legal cause of that injury. That same case discusses that if a tortfeasor inflicts an injury on a plaintiff that is identical to what the plaintiff would have received, notwithstanding the product defect, in that case the manufacturer may be absolved of liability. So in these circumstances, unless there is distinct proof that Willie Lomax was going to die that day, and there is no such evidence, there's a question of material fact under the substantial factor standard. The other case that the district court cited, too, for the proposition that but-for cause is required is Morisado. And the Morisado case actually discusses a secondary case. It was actually citing two United Exposition Services Company v. SIIS during the discussion of causation. And United Services is, again, off base. It is a workers' compensation issue, not a product liability issue. In fact, in that case, the injury was that a truck driver employed by United Exposition suffered chest confusions after striking his chest on the door of his truck in the course of employment. It has nothing to do with a product liability issue. Morisado further is not quite accurate in its summation of United Expositions, because even in that case, where it's workers' compensation, United Exposition states that a claimant need not prove but-for causation, but instead has the burden of showing that the claimed disability or condition was in fact caused or triggered or contributed to by the industrial injury. It need not be the sole cause of the injury. It must be a cause of the injury. Accordingly, both Fusakis and Morisado are poor basis for the district court to search for and find the proper standard for product liability. And that error was material to the decision. A substantial factor is particularly that test is particularly useful in multiple contributing cause situations, which is what is being argued by TASER and LVMPD in this case. They're saying that Mr. Lomax had physical ailments, et cetera, that contributed to the cause and that there was no direct proof that the TASER was actually responsible for the death. But that's not the proper standard. The evidence below shows that Metro was apparently aware of risk issuing policy directives and training programs stating that TASERs use conducted energy that affects the sensory and motor functions and that they should not be used on high-risk persons. They should only be used to stop a threat. They should not be used on persons in handcuffs. There was a string of training directives that showed that they were aware that this is a very potent weapon. Well, it's not that it's more dangerous to people in handcuffs than it is to people not in handcuffs. It just says there's no reason to do it when you have people in handcuffs. That's correct, Your Honor. It is. And here the paramedics told them that there was a reason to do it. Yes, Your Honor. That actually goes to the third issue on appeal of whether Officer Rader's conduct was objectively reasonable. Mr. Lomax was on a medical gurney, handcuffed and ready for transport. The medical personnel said that they could not transport him in that position. They needed to strap him to the medical gurney. So rather than ask them to remove Mr. Lomax from this omnipresent violence that is claimed by the appellants, Officer Rader simply undid the cuffs knowing that this individual was struggling and incoherent and then proceeded to TASE him repeatedly. And we think that's in violation of his training for a couple of reasons. The policy states that the TASER can be used as many times as is necessary. This is Las Vegas Metro's policy. The TASER can be used as many times as it takes to gain compliance. But that's an if-then. That's only if it should have been used in the first place. And the rest of the training says that under the factual circumstances of this case, it was not reasonable to use a TASER on this. Except that counsel, it was pretty clear to that point that the TASER had actually been effective. They had been able to get him into handcuffs when it looked like they would not be able to otherwise. And the officer and the other officials appeared to be in a bit of a difficult situation. They needed to get him on the gurney and couldn't do that with his hands handcuffed behind him. So the EMTs are the ones who asked that the cuffs be removed, which they did. That, of course, that created a different problem because he's still flailing about. So the TASER to that point had been effective in subduing him, and all they were trying to do was to get him into the soft restraints. That's true, Your Honor. It had been effective to the point of getting him into custody in the first place. The question is, at that point, did Officer Rader do everything he should have done to prevent uncuffing him and creating that same scenario over again that required five successive cases? How could they have gotten him into the soft restraints otherwise? Could have called for additional persons, for backup. I mean, they could have just moved him out of the way of danger at that point. It's unclear that Officer Rader ever asked the ambulance driver, would it be possible to go ahead and transport this individual because I'm worried about taking the cuffs off of him again. He's struggling. So the issue is, according to the training that Officer Rader is required to abide by, he was required to exhaust other means of response other than tasing, and he just opted for the repeated tasing. That may be a police department regulation, but that's never been the standard that we have held. We have never held that an officer is obligated to use everything, any other, any lesser means until you get to whatever it is, tasing or handcuffing or whatever. So that may be a violation of police department policy for which Officer Rader may be subject to discipline, but it's not a legal basis for us to assess liability, is it? I understand, Your Honor. The issue is whether he, whether Officer Rader should have known, could have known that that was going a step too far in terms of Mr. Lomax's civil rights with regard to his right to breathe, his right to survive this ordeal. And the indications are that Officer Rader had been trained that this is a very serious weapon. The training program says it has more stopping power than your firearm. Only use it to stop a threat. And our position is that he was not a threat when he was handcuffed lying on the gurney. Who had the knee in the back? That was one of the security officers. One of the housing security officers? Yes, sir. And he removed it prior to those final five tasings, I believe. When they first had him on there and they were struggling to get the cuffs, there was an individual on him. When the medical personnel came up, they asked him to get off of Mr. Lomax. But that was one of the security officers. Yes, Your Honor. Moving to the second issue, just since we haven't hit on it. The district court abuses discretion in finding that Dr. Woodward's opinions were inadmissible because, quote, Dr. Woodward has little to no training, experience, education or expertise related to electronic control devices generally or the taser specifically. And that specialization and that distinction drawn by the district court is irrelevant in this case. In the context of the facts below, specific knowledge of the taser is not required because the performance characteristics of the taser are undisputed. It's uncontested that tasers use conducted electricity. It's uncontested that that electricity affects the sensory and motor functions of the central nervous system and that electromuscular disruptions are designed to cause uncontrollable contractions of the muscle tissue and that the model of taser used by Officer Rader is designed to disrupt those major skeletal muscles through an electrical discharge. Even the amount of energy specifically that the taser emits is uncontested in the case. The district court cited to it stating that each operation of the taser delivers approximately 50,000 volts, 26 watts and .162 amps of electrical energy. Electrical pulses lasting 100 microseconds during which 1,200 peak volts enter the victim's body in the duration of each taser pulse. Whether a light socket or a taser produces that type of energy, that detailed amount of energy is irrelevant to the human body's reaction to that energy. But that is exactly what Dr. Woodard specializes in. He's a forensic pathologist with extensive experience in electricity's effect on the human body. Not only is the district court's decision an abuse of discretion with regard to the facts as they're uncontested in this particular case, but it's also an abuse of discretion under the law where it goes to the weight of the opinion, not the admissibility of the expert's testimony. Issues concerning the experience of an expert is methodology, survey, design, reliability, critique of conclusions and the like go to the weight of testimony rather than its admissibility. But the expert still has to get over the Daubert standard. Yes, Your Honor. But he does have specialized expertise. He is a forensic pathologist, highly experienced. He's testified numerous times as an expert with regard to electricity's effect on the human body. He's done numerous autopsies on electrocuted individuals. So he does have specialized expertise. The issue is, should he be required to have a specialized expertise in the TASER? And our position is it's just not necessary, because knowing, having a specialized understanding of the specific output of the TASER is not an issue where the specific output of the TASER is not at issue. We know what the performance characteristics are. We know how much electricity it generates. Any alleged lack of particularized expertise, according to this Court, goes to the weight of testimony and not the admissibility, and that's United States Garcia. To hold otherwise in this case and to allow the district court to require a specialized expertise in the TASER proper is to say that, in practicality, only TASER's experts can testify, because they're the ones that have the expertise in the TASER. But the district court should have been looking for the truth rather than TASER's paid advertising. The district court cited Lash v. Hollis for the general proposition that experts without a specific knowledge of TASER could be excluded. But that citation goes too far and has no merit on these facts. I'm afraid you're a couple of minutes over already.  Thank you, Your Honor. May it please the Court, good morning. My name is John Maley, Counsel for TASER Internationalist Matter. I'll be arguing for a few minutes for affirmance of Judge Pro's summary judgment ruling as to TASER, handing off then to Mr. Angulo, who's arguing on behalf of the police. The decision below as to TASER should be affirmed, Your Honors. Two issues have been raised by appellant. First, with respect to Dr. Woodard, the plaintiff's retained paid expert. Judge Pro did not abuse his discretion in determining that plaintiffs failed to meet their burden to show that he satisfied Rule 702 in Daubert. Recall, of course, that Dr. Woodard offered in a bare-bones, one-and-one-quarter page, so-called Rule 26 report, two opinions. The first was that repetitive and sustained usage of TASER would result in forced muscle contractions and interfere with compensatory hyperventilation. Yet he is not an expert on that subject. In deposing him and asking that question under oath, are you an expert on that subject? He admitted that he was not. And, in fact, as Your Honor pointed out, this device was applied in this occasion over 9 minutes and 55 seconds, seven times in drive-stunt, surface contact back here, not through the probes, with separation. The record is undisputed that in drive-stunt application, the device does not incapacitate the skeletal muscles. It does not override the central nervous system. And it's a completely different mode. So he is not qualified on that point. He admitted in the record at 536 he's not an expert on electronic control device induced muscular contractions. And, in fact, he admitted that there's he said that there's no testing out there on humans or animals on that subject. And, respectfully, he's just wrong. It's set forth in the record. There's an actual study involving 52 human volunteers, a peer-reviewed study, that indicates that there are no negative respiratory impacts on humans. Humans actually breathe more when they receive these applications. That's of record. That's undisputed. So his first opinion could not go to the jury because it was pure speculation, and the court exercised its discretion properly under Rule 702 to disallow that. Then there was a second opinion about so-called repetitive tasing, more likely than not, worsening the defendant's deceit's metabolic derangement. Now, these were very careful words that the doctor chose. He knew how to use the words reasonable degree of medical certainty, and in the record in his deposition he said, yes, I understand those words. I did not use those words in this opinion because he could not state that opinion to a reasonable degree of medical certainty. Why not? Because he acknowledges he's not an expert on that subject. Counsel has asserted that electricity is electricity is electricity. Well, a light socket, of course, ultimately is alternating current that is driven somewhere back with a generator someplace at a power plant. The Taser X26, Your Honors, is powered by the same thing that powers our camera, two 3-volt photocells. The waveform of the electrical current is very sophisticated and very unique, and for a jury to decide technical issues about impact of this weapon on humans, they need expertise. Nevada law is clear on that. You have to have someone to a reasonable degree of medical and scientific certainty who can speak to that subject. He admitted he's not an expert on the device. What does it do? In the drive-stun mode, Your Honor, it's merely a short span, and so it's a pain compliance tool. It sort of gets his attention in these average of four. What does the electricity do to the body? In a drive-stun mode, it does nothing, Your Honor. It travels between those two probes that are a few centimeters apart. In a probe application where there's a spread and the probes ---- No, no. I understand the difference, and this is the one we're talking about, the drive-stun mode. And in the drive-stun mode, Your Honor, the ---- It has no effect on the body other than to cause pain. That's correct, Your Honor. And the research, the scientific research that he didn't even bother to do, he said in his deposition, I was at a loss in researching Taser. That's what he said. There are scores of published scientific peer-reviewed medical articles on this with human volunteers. And so in drive-stun mode, Your Honor, electricity does not build up in the body. Static discharge, when we walk across and touch the door, it hits, it's gone. And that's the case here. Merely a get his attention so that the officer could get him properly secured. So there was no abuse of discretion, Your Honor, in prohibiting Dr. Woodard, the only expert that they've challenged on appeal. In fact, it would have been an abuse of discretion to allow him to testify. He didn't even know which model, for instance, was at issue. You have to be able to bring science to bear. So he did not satisfy Rule 702. The second assertion is that somehow Judge Proulx, a 23-year veteran of the Federal bench in the State of Nevada, applied the wrong Nevada standard in products liability. In fact, he did not, Your Honor. And we know that from his opinion. At page 21 of his order, he states, Plaintiffs have failed to produce any admissible evidence stating to a reasonable degree of medical certainty that the taser caused or contributed to Lomax's death. He never says it's but for. All through the briefing, and this was a substantial briefing at the district court level, substantial hearing and argument both on the Dawbert motions and on summary judgment. The parties were all talking the same language and citing the same case law, that it's substantial factor. The Court's opinion otherwise talks broadly about causation. And then it's clear from the conclusion of his opinion that Judge Proulx, in fact, does know Nevada law, and he knows that its contribution, in fact, substantial contribution. He even gave it, by this syntax, a potentially lower standard, more beneficial for the plaintiffs. Beyond his syntax, it's on the record, there is no competent scientific or medical evidence, and all they appeal is Dr. Woodard, that this device somehow substantially contributed to this man's death. The record is undisputed. This man took regularly illegal drugs. This night it was PCP. When they first come to the scene, his heart rate is 215 beats per minute. 215 beats per minute. He is in serious compromised state at that point in time. Police did what they could to try to secure him, get him help, but he put himself and with his preexisting cardiac damage into this situation. So there was no basis from which a jury could find in favor of the plaintiff on causation. Judge Proulx respectfully got it correct. Summary judgment should be affirmed as the taser. I'll yield to Mr. Angulo. Thank you, Your Honors. Thank you. Good morning, Your Honors. Peter Angulo on behalf of LVMPD and Officer Rader. Essentially what's at issue on this appeal is the actions of Officer Rader alone. Plaintiffs or appellants have not appealed the policies that exist or the training that exists for LVMPD or even the State law claims in their application in this case. Could you speak up a little? I could. I should. What's not been appealed, Your Honors, is the training or policy of LVMPD or the application of State law claims in this case, but rather solely the actions of Officer Rader that day. As a factual matter, the first two applications of the tasing by an appellant's own expert was held to be appropriate. In fact, the third tasing done after he was placed on the gurney and in handcuffs and then when the handcuffs were removed, an appellant's own expert also agreed, Mr. Martinelli agreed, that that tasing was also appropriate. His problem came with the last four because he said based on Officer Rader's training and experience, he should have felt that that was not appropriate, although he agreed that Officer Rader at that time could certainly have believed, honestly believed, that in fact it was appropriate, that it was effective in temporarily incapacitating this gentleman so that they could get him transferred into the soft restraints. Given the extant law for Fourth Amendment jurisprudence at the time, it is respectfully submitted to this Court that there was nothing that was presented to Officer Rader that would make him think that his actions fell afoul of any constitutional prohibitions regarding the application of force or the application to control an individual who was being resistive and fighting. There's no indication at all in the record that at any time was an application of the taser used when he wasn't resisting, when he wasn't flailing about or trying to assault another individual. And given LVMPD's correct policies, the use of the taser fell at a level three, where an officer could choose between hands-on and using various physical restraint methods, where he could use a baton or pepper spray, or the application of a taser. Because of the effectiveness which had been shown with him, he used the taser. Unless there are specific questions from the Court, Your Honor, I'm going to go ahead and sit down, because I believe that the record is relatively clear, very clear. Counsel, I do have one question. You argued just a minute ago that Officer Rader's actions did not violate any constitutional law established at the time. That's an argument for qualified immunity. Are you arguing or are you willing to concede then that it may have been a violation of the Fourth Amendment? No, Your Honor. At the time, nothing in Fourth Amendment jurisprudence, even to date, suggests his application of force for an individual who's resistive. Given what was known about the taser, it was inappropriate. How does this case play out under our recent decisions in Mattos and Bryan v. McPherson? Well, Your Honor, I think what's still required is a consideration of, under those decisions, the threat that's presented to the officer. And then considering all the relevant factors, whether or not that use of force is excessive in light of the threat that's being presented. Well, do you see a difference between the drive stem mode and the probe mode? There is, Your Honor, both in terms of the drive stem mode and the probe mode. Bryan v. McPherson, at least, is when you shoot from a distance at somebody. Correct. And does that affect this case? Well, I don't know that it necessarily affects this case. The prongs go into you? I'm sorry, Your Honor? If you shoot somebody from a distance and the prongs go into you, is that what's the relevance of that case to the probe mode? Well, the difference is the effect of, I guess the relevance would be, is the difference of effect it has on the human body. The application of probes gives a more global effect to the human body as far as muscle incapacitation, or I should say voluntary muscle incapacitation. An individual is still mobile, as I understand. They can still be put in handcuffs. They're not rigid. They simply are unable to move their hands voluntarily during the time that the electricity is applied. That does not apply in the case of a probe mode. The application of it to certain nerve areas, in this case the brachial plexus, is designed to create a pain stimulation and try to obtain compliance similar to the use of a baton or the use of pepper spray or the use of various restraint techniques. For example, an ignition twist in handcuffs or something along those lines. This doesn't force him to his knees. It's not going to bring him down. No. No. Well, I suppose if the pain was enough, it might drop you to your knees, but it doesn't physically stop him from being able to stand up. It doesn't physically stop him from being able to resist. It simply distracts him and causes, in this case, the experience they had with this gentleman was that the application caused him to temporarily cease his hostilities only for a second or two, but it was enough time for them to get him on the ground initially, secondly to get him in handcuffs, and then at the last as they were struggling on this gurney as he's thrashing about and violently thrashing to get his limbs restrained as they turned him over and got him affixed to the gurney. And so, Your Honor, you asked me about qualified immunity. I'm not conceding this is a violation of the Fourth Amendment. However, alternatively, what we've argued to the Court and what Judge Proheld was that even if this was somehow a Fourth Amendment violation, which he did not see, that under clearly established law at the time, nothing he did was inappropriate, did not fall outside the extent parameters in the Ninth Circuit or under the Supreme Court law or any other case law that I could locate, at least, that said that this kind of application in these type of circumstances would lead any reasonable officer to believe that they acted in violation of the Fourth Amendment. And with that, unless there are additional questions, I'll go ahead and sit down. Thank you, Your Honors. Just a couple of points. First, in following up on the Court's question with regard to Dr. Woodard's specific testimony, he stated, to a reasonable degree of medical certainty, I can state the following. I concur with the conclusions expressed by the medical examiner that the cause was related to multiple factors secondary to restraint procedures. These factors would include taser administration. Repetitive and sustained usage of the taser would result in forced muscular contractions and interfere with compensatory hyperventilation required for immediate physiologic correction of acidosis. Isn't that opinion just wrong? I don't believe so, Your Honor. You know, taser's experts say that it doesn't have any effect in terms of muscular skeletal reaction in the drive mode. But at the same time, Officer Rader was specifically instructed that pain compliance does not work on people under the influence of PCP. It's repeatedly in their training. Do not use that mode on PCP. But that's because the victim has got some kind of disconnect between sort of his head and his body. That's correct, Your Honor. And he's not feeling anything. But that seems to be contrary to the officer's actual experience with this guy. They suspect that the guy's high on PCP. Does anybody actually know that he's taken PCP? Did they know that at the time? He had been diagnosed previously. These security officers had run into him before, and I think there was testimony that he smelled. He had the odor. I mean, they suspected that he was probably doing PCP. Right. They didn't see. Would anybody really know that? I mean, was the officer responsible for knowing that he was on PCP? No, Your Honor. He's not. But it also goes back to this issue of what happened when he was tased. He didn't just become docile because he was hurt. He went limp for a period of time. I mean, he tensed up and then went limp. And Captain Lawrence Spendlove, the senior medical officer on scene, said that after the last tasing he went docile and didn't move. He was unresponsive from that point forward. And I just want to hit one more piece of evidence. The medical examiner that conducted the autopsy did say that there were some problems with Mr. Lomax's health, but he was only 26 years old. He had very mild, what the coroner called very mild, fibrosis of the heart. He was not in danger of dying at the moment that he was walking around in that parking lot, and there was no evidence to the contrary. And lastly, the thin-skull plaintiff doctrine would apply to any of those allegations that, you know, that he was wounded to start with and that this was just an aggravation of the situation. Unless the Court has any further questions, I will conclude. Thank you, Your Honors. Case to target is submitted.
judges: Selna, Reinhardt, Bybee